**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-03-191 |
| | § | C.A. No. C-07-140 |
| LUIS NAPOLES, | § | |
| Defendant/Movant. | § | |

**ORDER DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE,
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL**

Pending before the Court is Luis Napoles' ("Napoles") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, which was received by the Clerk on March 22, 2007. (D.E. 503.)[1] The Court ordered the government to respond, and the government filed a combined answer and motion to dismiss on May 21, 2007. (D.E. 504, 505, 506.) Napoles filed a reply on June 19, 2007. (D.E. 509.)

On July 23, 2007, Napoles filed a "supplemental" § 2255 motion, which sought to add claims to his additional motion. (D.E. 511.) The Court ordered the government to file a supplemental response (D.E. 512), and the government filed its response and motion to dismiss the supplemental § 2255 motion on August 24, 2007. (D.E. 514, 515.)

The Court has considered all of the submissions of the parties and the record in this case. As discussed in detail herein, most of Napoles' claims are subject to dismissal because he waived his right to file those claims. His other claims, which arguably fall outside the scope of his waiver, fail on their merits. For these reasons, the Court DENIES his § 2255 motion and DENIES his motion for

---

[1] Docket entries refer to the criminal case, C-03-cr-191.

1

appointment of counsel.  Additionally, the Court DENIES Napoles a Certificate of Appealability ("COA").

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## II.  FACTS AND PROCEEDINGS

A.      **Summary of Offense[2]**

From 1996 until August 2003, a loosely organized group of businessmen in Corpus Christi, Texas, were involved in smuggling large quantities of cocaine, marijuana and heroin from Mexico to Corpus Christi, Texas for further distribution within the United States.  Napoles was one of four leaders of the organization, all of whom also laundered the proceeds from the drug sales through their businesses and purchases of property.  The leaders insulated themselves from the criminal activity through their legitimate businesses and through the use of subordinates who carried out the importation, transportation and distribution of the illegal substances.  As many as twenty people were involved in the organization.  Napoles was a main source of cocaine and owned two restaurants in Corpus Christi.

Various cooperating co-defendants and cooperating co-conspirators provided testimony implicating Napoles, and their testimony was frequently corroborated by surveillance, telephone records, and analysis of vehicle and property transactions.  (See generally PSR at ¶¶ 8-38.)  The outline of the facts as set forth by the Government at the rearraignment, and not disputed by Napoles (D.E. 460, Rearraignment Transcript ("R. Tr.") at 39-40), are as follows:

On October 18, 2002, Joaquin Castro ("Castro") was arrested by DPS while headed south on Interstate 37.  He was driving a car which had a hidden compartment in it containing approximately

---

[2]  The facts of the offense as set forth herein are derived from Paragraphs 1 through 38 of the Presentence Investigation Report ("PSR").

$76,000 in U.S. currency.  After his arrest, Castro began to cooperate and admitted that he had been making trips transporting cocaine from Corpus Christi to various locations in Oklahoma.  Castro said he had been recruited into the conspiracy by his nephew, Juan Antonio Castro.  On the day of his arrest, Castro identified an individual by the name of Luis as being the supplier of the cocaine.

On the same date, October 18, 2002, the United States was operating a pen register on one of the cell phones employed by Napoles.  The government noticed a pattern of calls between phones in Oklahoma, used by the Oklahoma participants in the conspiracy, and the cell phones used by Napoles, especially after the seizure of the money.

Castro showed the government several locations in Corpus Christi where he had met with Napoles on several occasions to pick up cocaine.  He said that the vehicle that he was caught in had been supplied to him in when he first came to Corpus Christi in September of 2002 to pick up a load of cocaine.  Castro told authorities that this was going to be his third trip to pick up cocaine. (R. Tr. at 38-39.)

Both Castro and another individual, LaTroi Wilson, who was a drug distributor from Oklahoma, would testify that the amount of cocaine listed in Count 10 of the indictment against Napoles (3 kilograms) was cocaine which successfully made it to Oklahoma and for which Wilson paid money to the Castros to be sent back to South Texas.  The money and the secret compartment in the car Castro was driving tested positive for the presence of cocaine.  In addition, there were several cooperators who would testify against Napoles to show that he had been involved in cocaine distribution in Corpus Christi since about 1996.  (R. Tr. at 39.)

**B.  Criminal Proceedings**

On September 19, 2003, a fourteen-count first redacted superseding indictment was filed against Napoles and a number of co-defendants.  (D.E. 185.)  Napoles was named in three of the counts. Specifically, Count 1 charged him with conspiracy to knowingly and intentionally possess with

intent to distribute less than 500 grams of cocaine, in violation of 21 U.S.C. ¶¶ 846, 841(a)(1) and 841(b)(1)(C).  (D.E. 185.)  In Count 2, Napoles was charged with conspiracy to knowingly and intentionally conduct financial transactions in and affecting commerce involving the proceeds of illegal activity, that is, the distribution of cocaine, with the intent to promote the carrying on of the illegal activity, in violation of 18 U.S.C. § 1956(h) and 1956(a)(1)(A)(i).  Finally, Count 10 charged Napoles with knowingly and intentionally possessing with intent to distribute 3 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B). (D.E. 185.)  The indictment also included a notice of criminal forfeiture, which sought the forfeiture of property and currency, including two properties owned by Napoles and co-defendants, and $1.5 million in United States dollars as to Napoles and another co-defendant.

### 1.  Rearraignment

On October 27, 2003, Napoles pleaded guilty to Counts 2 and 10 pursuant to a written plea agreement with the government.  (D.E. 293, 294.)  In exchange for his guilty plea and his waiver of appellate and § 2255 rights (discussed below), the government agreed to recommend a sentence at the lowest end of the applicable guideline range, to recommend that he be given a three-level credit for acceptance of responsibility, and to move to dismiss the remaining counts at the time of sentencing. (D.E. 294 at ¶¶ 1-2, 13.)  Napoles also agreed to make a "full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest."  (D.E. 294 at ¶ 10.)  He specifically agreed to forfeit any interest in assets that related to his distribution of controlled substances and to cooperate with the United States in the forfeiture of $ 200,000 in United States dollars. (D.E. 294 at ¶¶ 10-11.)

Additionally, the plea agreement included a voluntary waiver of Napoles' right to appeal and to file a § 2255 motion:

Defendant is aware that Title 18 U.S.C. § 3742 affords a defendant the

4

> right to appeal the sentence imposed.  The defendant waives the right to appeal the sentence imposed or the manner in which it was determined.  The defendant may appeal <u>only</u> (a) the sentence imposed above the statutory maximum; or (b) an upward departure from the Sentencing Guidelines, which had not been requested by the United States.  Additionally, the defendant is aware that Title 28, U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding.

(D.E. 294 at ¶ 7 (emphasis in original).)  The agreement was signed by both Napoles and his counsel.

 (Id. at 7.)

At Napoles' rearraignment, the Court specifically questioned Napoles under oath to ensure that his plea was voluntary and knowing and to ensure that he understood and was voluntarily relinquishing his appeal rights and right to file a § 2255 motion:

> **THE COURT:** ... Further, you give up another matter called – another right to set aside your conviction called a post-conviction remedy, or a statutory 2255.  Even if you don't appeal, you would have had the right to try to come in and set aside your conviction based on such matters as challenge to the jurisdiction of the Court, constitutionality of your sentence, and such matters as whether or not you had ineffective assistance of counsel.  But if you go forward today, you waive all these valuable rights.
> And another matter is that the U.S. Attorney is not giving up his right to appeal. Do you understand this? ... Mr. Napoles?
>
> **DEFENDANT NAPOLES**: Yes.

(R. Tr. at 23-24.)

The Assistant United States Attorney then summarized Napoles' plea agreement, including a reference to the waiver of § 2255 rights.  (R. Tr. at 25.)  Napoles testified that the summary was his entire agreement, and that he understood it.  (R. Tr. at 26.)  He also testified that there were no other agreements or promises made to him that were not contained in the written document, including any promise that he would get leniency, safety valve, or a motion for downward departure.  (R. Tr. at 26.)

The Court showed Napoles a written copy of the plea agreement.  (R. Tr. at 26.)  He testified

5

that the document was his plea agreement, that he had signed the last page, and that it had been read to him and explained to him by his attorney completely in Spanish, and that he had discussed it completely with his attorney before he signed it. (R. Tr. at 26-27.) It is clear from the foregoing that Napoles' waiver of § 2255 rights was knowing and voluntary. See Fed. R. Crim. P. 11(b)(1)(N) (obligating court to ensure defendant understands any waiver of § 2255 rights and appellate rights prior to accepting his plea).

### 2. The Presentence Investigation Report

The Court ordered the U.S. Probation Office to prepare a Presentence Investigation Report. (D.E. 295.) The Revised PSR calculated Napoles' base offense level for the offense at 36, holding him accountable for 48 kilograms of cocaine and 900 kilograms of marijuana, or the equivalent of 10,500 kilograms of marijuana.[3] It recommended that Napoles be given a four-level upward adjustment for his role in the offense, which was as an organizer or leader of a criminal activity involving five or more participants. (PSR at ¶ 47.) It also recommended a two-level enhancement for obstruction of justice, because it found he was involved in attempting to threaten a witness and also tried to coerce the same witness to lie about Napoles' participation in the offense. (PSR at ¶ 48.) It further recommended a three-level adjustment for acceptance of responsibility, resulting in a total offense level of 39. (PSR at ¶¶ 44-53.) When coupled with his criminal history category of I, his resulting guideline sentence for a term of imprisonment was 262 to 327 months on Count 10, and the statutory maximum of 20 years as to Count 2. (PSR at ¶¶ 73-76.)

Napoles, through counsel, filed written objections to the PSR. (D.E. 354.) Specifically, he objected to the PSR's determination that he should be held accountable for any drugs other than the

---

[3] The initial PSR calculated Napoles' base offense level at 34, but the Probation Department learned of additional relevant conduct from the debriefings of other defendants, which increased the base offense level to 36. (See D.E. 461, 1st Sentencing Transcript ("1 S. Tr.") at 4-5.)

3 kilograms of cocaine.  He also objected to the increases for his role in the offense and for obstruction of justice.  (PSR at pp. 25-26.)

### 3.  Sentencing

The case was called for sentencing on January 14, 2004. (D.E. 20.)   The Court first heard testimony from LaTroi Wilson, who testified that after Joaquin Castro was arrested, the "big boss" ordered Juan Antonio Castro to get his uncle, Joaquin, out on bond and then kill him, although Wilson did not know who the "big boss" was.  (D.E. 461, 1st Sentencing Transcript ("1 S. Tr.") at 36-45.)

Joaquin Castro testified next.  He testified that his nephew, Juan Antonio Castro, had gotten him involved in transporting drugs and money between Oklahoma and Corpus Christi.  He explained that he flew on a plane from Oklahoma to Corpus and that Napoles gave him a car that he and Napoles loaded with drugs for Castro to drive back to Oklahoma.  He then delivered the drugs to his nephew.  Castro testified that, on a later occasion, he then drove the same vehicle back to Corpus Christi, and brought back two or three kilos of cocaine to Oklahoma which he received again from Napoles.  He then described a third trip, which was the time that he was caught driving with the money inside the same vehicle.  Finally, he testified that his wife had told him that his nephew had threatened him and his family, but he did not know where – or with whom – those threats originated. (1 S. Tr. at 45-56.)

The third individual to testify was Manual Gutierrez.  Gutierrez was a drug dealer from Atlanta and testified that he obtained cocaine from Napoles in Corpus Christi on several occasions.  He testified that on three occasions, he obtained seven kilograms of cocaine each time, and on another occasion, he obtained four kilograms of cocaine.  On different occasions, Gutierrez had twice sold Napoles 10 kilograms of cocaine. Gutierrez also testified that he purchased a house from Napoles for $45,000 and two vehicles which he paid for in cash earned from drug sales. (1 S. Tr. at 57-63, 73-74, 77-78.)

Gutierrez also testified about the kidnapping of his brother, Jose Gutierrez. Gutierrez testified that he believed Napoles and an individual named Quezada had kidnapped his brother. His brother was kidnapped in Corpus Christi, but Gutierrez was in Mexico at the time. He testified that he received a number of phone calls over the course of a week telling him that he would have to come to Corpus Christi to pay the ransom money. He believed it was Napoles' voice on the phone during one of the calls. (1 S. Tr. at 64-67.) Napoles told him that he needed to pay money or that his brother would be killed in two hours. (1 S. Tr. at 67.) He also testified about other calls between him and Napoles related to the kidnapping. (1 S. Tr. at 71-72.)

Gutierrez worked with the police all week, but when the police got close to the kidnappers, the kidnappers called and told him to have the police stop investigating them because his brother was being freed and left at an HEB store. (1 S. Tr. at 68.) His brother was released after a week and Gutierrez went to pick him up. Apparently he had two broken arms, his face was badly bruised and he is still mentally incapacitated due to being beaten. (1 S. Tr. at 67-68.)

Gutierrez further testified that prior to the kidnapping, Napoles had been at his house and Napoles had jokingly said that he would bet $100,000 that Napoles didn't have 100 kilos of cocaine in the house, and in fact there were only 10. Gutierrez believed that his brother had been kidnapped because Napoles needed cocaine from Gutierrez due to Napoles' cars being caught at the checkpoint. (1 S. Tr. at 76-77.)

After hearing all of this testimony, but before hearing from Agent Roddy, the Court informed Napoles and his attorney that it was looking at the top category based on the additional testimony. (1 S. Tr. at 83-84.) The sentencing was continued to February 12, 2004, when the Court heard testimony from Agent Roddy regarding his investigation of the case.

Agent Roddy testified that in his 22 year of experience in law enforcement, 20 of which were devoted to narcotics investigations, Napoles ranked as one of the top three cocaine dealers in Corpus

Christi.  (D.E. 425, 2nd Sentencing Transcript ("2 S. Tr.") at 7-8.)  Roddy testified that he agreed with the assessment that Napoles should be held responsible for between 50 and 150 kilograms of cocaine, which would give a base offense level of 36.  (2 S. Tr. at 14-15.)

Agent Roddy explained how there was an increase in the monitored traffic on Napoles' cell phone and others after Joaquin Castro's arrest.  Some of these calls were recorded from the jail where Castro was being held.  (2 S. Tr. at 9-10.)  Based on his knowledge of the conspiracy, Roddy also believed that the threat to do harm to Joaquin Castro if he cooperated came from Napoles.  (2 S. Tr. at 19.)  Roddy testified that Napoles was at least a suspect in the kidnapping of Jose Gutierrez, as well, as confirmed with the Corpus Christi Police Department. (2 S. Tr. at 20.) Roddy further testified that there were at least five people in the conspiracy and that there was "absolutely no doubt" in his mind that Napoles exercised management responsibility in the cocaine trafficking organization.  (2 S. Tr. at 23.)

At the conclusion of all testimony, the Court overruled defense objections to an increase for the leadership role, relevant conduct, and obstruction of justice.  (2 S. Tr. at 28-29.)  Defense counsel again argued against the amount of drugs used to determine relevant conduct (2 S. Tr. at 29-31.)  The Court again stated that it overruled all of the defense objections. (2 S. Tr. at 31.)  The Court found a total offense level of 39.  Coupled with Napoles' Criminal History Category I, the resulting range of imprisonment was from 262 months to 327 months on Count 10, and 240 months on Count 2.  (2 S. Tr. at 31-32.)  The Court sentenced Napoles to 300 months on Count 10, and 240 months on Count 2, to run concurrently, to be followed by a five-year term of supervised release on Count 10 and three years on Count 2.  (2 S. Tr. at 34.)   The Court also imposed a $100 special assessment on each count, and a fine of $1,000.  (2 S. Tr. at 34.)  Consistent with the parties' agreement, the Court also imposed a $200,00 forfeiture.  (2 S. Tr. at 35.)  Additionally, the Court ordered a turnover of approximately $72,000, which were the proceeds from a sale of property the Court found to be the proceeds of

illegal drug sales.  (2 S. Tr. at 43-45.)

Judgment of conviction and sentence was entered February 23, 2004.  (D.E. 399.)  Despite his waiver of appellate rights, Napoles nonetheless timely appealed.  (D.E. 400, 401.)  The appeal was initially dismissed due to Napoles' failure to pay the docketing fee (D.E. 431, 432), but the Fifth Circuit later reinstated it.  (D.E. 457.)

On February 23, 2006, the Fifth Circuit dismissed the appeal as frivolous, relying on Napoles' appellate waiver in his plea agreement.  (D.E. 500.)  The appellate court specifically concluded that "[t]he record reflects that Napoles knowingly and voluntarily waived his right to appeal his sentence." (D.E. 500 at 2.)  Napoles did not file a petition for writ of certiorari.  Napoles' timely § 2255 motion was received by the Clerk on March 22, 2007.  (D.E. 503.)  The government has responded and has also filed a motion to dismiss.  (D.E. 505-507.)  The Court has considered Napoles' reply (D.E. 509), as well as a "supplemental motion" filed by Napoles on July 23, 2007 (D.E. 511), the government's response thereto (D.E. 514, 515), and Napoles' reply.  (D.E. 520.)[4]  Also pending before the Court is Napoles' motion to appoint counsel.  (D.E. 510.)

### III.  MOVANT'S ALLEGATIONS

In his original § 2255 motion, Napoles lists three grounds for relief.   In his first ground for relief, he alleges that he received constitutionally ineffective assistance from his counsel during the criminal proceedings, Everto A. Villarreal, Jr., as a result of numerous errors by counsel.  These include claims that counsel allegedly failed to provide effective representation during plea negotiations because: (1) counsel failed to properly advise him regarding his true sentencing exposure; (2) counsel failed to explain his § 2255 rights and waiver to him; and (3) counsel failed to ensure that he obtained a downward departure motion for substantial assistance.

---

[4]  Napoles' reply to the government's supplemental response is titled as a "traverse response." (See D.E. 520 at 1.)

As to the alleged failure to advise him regarding his sentencing exposure, Napoles contends that counsel told him he would probably get "around five (5) years" if he pleaded guilty and turned over certain monies to the government. He also claims that counsel failed to explain to him that he was waiving his rights to collaterally attack his sentence and told him that the "judge would go along with the deal struck between the United States Attorney and counsel." (D.E. 503 at 5.) Although he acknowledges that the Court told him otherwise, he claims that his counsel told him that the judge's comments "were merely standard practice" and that he should "relax because the (60) months deal would go through without any trouble." (D.E. 503 at 6.) He explains that he was able to be easily misled by counsel because he had only a "third grade education," "could not read or write English" and was unfamiliar "with the criminal judicial process." (D.E. 503 at 7.)

As noted, Napoles also contends that, had he understood what "Title 28 U.S.C. § 2255" or "collaterally attack" meant, he would not have waived his right to file such a motion. (D.E. 503 at 9.) He faults his counsel for failing to properly explain these terms to him.

Napoles also claims that counsel was ineffective because he did not accurately inform Napoles as to what was required in order to obtain a motion for downward departure based on "substantial assistance." (D.E. 503 at 10-11.) Napoles avers that counsel told him that if he was truthful about his own criminal conduct and turned over certain currency and assets, he would receive a motion for downward departure. (D.E. 503 at 11.) Again, he alleges that he signed the plea agreement "only because counsel advised that doing so was in Movant's best interest, and because the Agreement – coupled with counsel's oral assurances – promised a lessor [sic] sentence than would have otherwise been given if the Movant went to trial and lost." (D.E. 503 at 12.)

He further claims that his counsel was constitutionally ineffective for failing to object to the government's alleged breach of the plea agreement, and for failing to move to withdraw Napoles' guilty plea as a result of the breach. Napoles specifically claims that he asked counsel during the

rearraignment whether he could elect to proceed to trial because the judge's statements were causing him apprehension, and that his counsel advised him that it was "too late" and that he had to go forward with his guilty plea.  (D.E. 503 at 17.)  Napoles also claims that, after the rearraignment, he specifically asked his counsel to move to withdraw the guilty plea and that his counsel refused. (D.E. 503 at 17.)

He also complains of alleged errors by counsel during sentencing.  Specifically, he claims that counsel failed to properly object to and argue against a 2-level increase for obstruction of justice and a 4-level increase for his leadership role. (D.E. 503 at 18-20.)

In his second ground for relief, Napoles faults appellate counsel for failing to submit facts and argument that would support the invalidity of Napoles' appellate waiver and guilty plea.  (D.E. 503 at 20-21.)

Napoles' third ground for relief essentially reiterates his first.  That is, Napoles claims that his guilty plea was not knowing and voluntary because he did not receive effective assistance of counsel during the plea bargaining process, as set forth in his first ground. (D.E. 503 at 21-22.)

In his "supplemental" motion, received by the Clerk on July 23, 2007,[5] Napoles attaches an affidavit from Juan Antonio Castro.  Napoles offers the affidavit as support for his claim that he did not tell Juan Antonio Castro to threaten or murder his uncle, Joaquin Castro, as discussed at his sentencing and thus that he is "actually innocent."  He claims that his sentence should not have been enhanced accordingly.  (D.E. 511.)  The Court ordered the government to file a supplemental response, and also had the affidavit, which was entirely in Spanish, translated by the Court's staff interpreter.  In pertinent part, the affidavit states that neither Napoles or anyone else never told him

---

[5]  Because the Court determines that the additional claim raised in Napoles' supplemental motion is barred by his waiver, it does not address whether this additional claim relates back to the original motion, or is otherwise timely.

(Juan Antonio Castro) to threaten or kill his uncle.[6]

The government has moved for the dismissal of Napoles' motion in its entirety on the grounds that it is barred by his waiver of § 2255 rights.  In the alternative, the government contends that his motion is subject to dismissal because the record in the case conclusively shows that no relief is appropriate as to his underlying allegations.  (D.E. 32, 33 at 1.)  In its supplemental reply, the government addresses Napoles' supplemental claim.  The government argues that his new claim of "actual innocence" is not timely and does not relate back to his initial § 2255.  The government further argues that the motion is a second or successive § 2255 motion and that Napoles has not sought or received permission from the Fifth Circuit to file it.  For these reasons, the government contends that his supplemental claim is not properly before the Court.  In the alternative, and pursuant to the Court's instructions, the government also addresses the merits of Napoles' supplemental claim and argues that it is subject to dismissal because of his waiver and that it fails on its merits.

For the reasons set forth herein, Napoles' claims fail.

## IV.  DISCUSSION

### A.      28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not

---

[6]  Notably, although Castro's affidavit contradicts testimony that was before the Court from other witnesses at the sentencing hearing, Juan Castro did not actually testify at the hearing.  By contrast, the individuals who testified at the sentencing on this issue were observed by the Court and found to be credible.

have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).  "[A] collateral challenge may not do service for an appeal."   United States v. Frady, 456 U.S. 152, 165 (1982).

The Court need not address whether Napoles has procedurally defaulted his claims by failing to raise them on appeal.  Rather, the Court concludes that he validly waived some of his claims, i.e., his claims of ineffective assistance at sentencing and on appeal and his supplemental claim regarding whether or not he was properly subjected to an enhancement for obstruction of justice. These claims fall squarely within the scope of his waiver, and thus the Court does not reach the merits of those claims. See infra Section IV.C.; United States v. Wilkes, 20 F.3d 651 (5th Cir. 1994) (enforcing defendant's voluntary and knowing waiver of § 2255 rights).

His claims of ineffective assistance of counsel during the plea negotiation process and his related claim that his plea was unknowing or involuntary, however, directly challenge the validity of his plea and his waiver.   Accordingly, they fall outside the scope of his § 2255 waiver. See, e.g., United States v. White, 307 F.3d 336, 343-44 (5th Cir. 2002) (an ineffective assistance claim survives a waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself"); cf. United States v. Branam, 231 F.3d 931, 931 n.1 (5th Cir. 2000) (considering defendant's argument that United States breached the plea agreement, despite an appeal-waiver provision in the plea agreement).  Thus, the Court turns first to these claims.

**B.     Alleged Ineffective Assistance of Counsel As to Plea**

An ineffective assistance of counsel allegation presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial.  Id.  This means that a movant must show that counsel's performance was outside the

broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001). If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

Napoles argues that his attorney was deficient during the plea process for: (1) failing to advise Napoles of his true sentencing exposure, instead advising him that he would probably receive a 60-month sentence; (2) failing to properly explain that he was waiving his § 2255 rights; (3) failing to object to the government's alleged "breach" of the plea agreement and to move to withdraw Napoles' guilty plea as a result of the breach; and (4) telling Napoles he'd get a downward departure for substantial assistance.

When viewing the record as a whole, it is clear that Napoles cannot establish his burden on any of these claims, because his testimony at the rearraignment and the plain record of this case refute them.

### 1.  Alleged Failure of Counsel to Advise of True Sentencing Exposure

In order to show prejudice arising from an attorney's ineffective assistance during the plea negotiations or the plea itself, Napoles must show that, absent his counsel's deficiencies, he would have proceeded to trial. See United States v. Glinsey, 209 F.3d 386, 392 (5th Cir. 2000) (in order to show prejudice as a result of ineffective assistance during the guilty plea process, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial") (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

This is a showing that cannot be met here.  The rearraignment transcript clearly establishes that Napoles' decision to plead guilty was his own and that it was entirely voluntary.

At his rearraignment, Napoles testified that his attorney had answered all of his questions and was following his instructions, that his attorney came to see him in jail and took his phone calls, that he was satisfied with the advice and efforts of his attorney, and that he was able to communicate with his attorney completely.  (R. Tr. at 11-13.) The Court informed Napoles of the various trial rights available to him, and he testified that he understood that if he pleaded guilty, he would be giving up those trial rights.  (R. Tr. at 18-24.)

Consistent with Rule 11, Fed. R. Crim. P., the Court explained to Napoles the maximum punishment that he might receive on each of the two counts to which he was pleading guilty. Specifically, the Court informed him that he faced a maximum punishment on Count 2 of twenty years in prison, and a maximum fine of $ 500,000.  The Court also informed him that there was a mandatory $100 special assessment, and a maximum supervised release term of three years.  (R. Tr. at 29.) Napoles testified that he understood.  (R. Tr. at 29.)  As to Count 10, the Court informed him that there was a mandatory minimum of 5 years, but that he could spend up to 40 years in the Bureau of Prisons. The Court also informed him of a maximum $10 million fine, a minimum supervised release term of 4 years and a maximum of life, and the mandatory $100 special assessment.  (R. Tr. at 29-30.)  Again, Napoles  testified  that  he  understood.    (R.  Tr.  at  30.)

Napoles further testified that no one had forced him to plead guilty and that his decision to plead guilty was entirely voluntary.  (R. Tr. at 35.)  He testified that he was pleading guilty because he was, in fact, guilty.  (R. Tr. at 42.)

Napoles' sworn statements in open court are entitled to a strong presumption of truthfulness. United States v. Lampaziane, 251 F.3d 519, 524 (5th Cir. 2001) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).  Indeed, the Fifth Circuit affords "great weight to the defendant's statements at

the plea colloquy." United States v. Cothran, 302 F.3d 279, 283-84 (5th Cir. 2002). Napoles' sworn statements show that he understood the charges against him, he understood the possible maximum sentence he faced, and he was not coerced into pleading guilty.

In short, Napoles cannot establish that he would have proceeded to trial absent the alleged deficiencies of counsel. Thus, this claim fails.

### 2. Alleged Failure to Properly Explain § 2255 Waiver

Napoles' second challenge to the § 2255 waiver is that his lawyer was ineffective for failing to properly explain the consequences of his § 2255 waiver to him. Significantly, however, even where an attorney has failed to properly explain something prior to the rearraignment, no valid ineffective assistance claim exists if the Court corrected any such failure. See Lott v. Hargett, 80 F.3d 161, 167-68 (5th Cir. 1996) (a defendant suffers no prejudice due to receiving misinformation from his attorney where the plea colloquy reflects that the district court corrected any such misinformation). In this case, then, even if counsel was deficient for failing to properly advise Napoles concerning his § 2255 waiver, the Court corrected any such error and thus Napoles cannot show prejudice. Indeed, the Court was very deliberate and clear in explaining Napoles' waiver of § 2255 rights. (See R. Tr. at 23-24.) Napoles testified that he understood. (R. Tr. at 23-24.) Again, his statements under oath are entitled to a presumption of truthfulness, Lampaziane, 251 F.3d at 524, and Napoles had not rebutted that presumption.

This claim fails on its merits.

### 3. Alleged Failure to Object to "Breach" of Plea Agreement

Napoles' third challenge to his plea agreement is that the government breached the plea agreement and that his counsel was ineffective for failing to challenge that breach. This claim is wholly without merit.

Although Napoles claims that the government promised him a 60-month sentence in his plea

agreement, that assertion is flatly contradicted by both the written plea agreement and by his own testimony at rearraignment.  Specifically, there is no mention in the written plea agreement of any promised sentence.  To the contrary, the agreement specifically states that:

> Neither the Government nor any law enforcement officer can or does make any promises or representations as to what sentence will be imposed by the Court.

(D.E. 294 at ¶ 6.)

The Court reiterated this point at the rearraignment, telling Napoles that the Court was not a party to the agreement, that the agreement was not binding on the Court in any way, and that he would not know whether the Court would follow any part of it until the time of sentencing, when it would be too late for him to withdraw his plea.  (R. Tr. at 28.)  Napoles testified that he understood.  (R. Tr. at 28.)  The Court also specifically asked:

> Do you understand that the final decision as to what your sentence will be rests with me and not with the U.S. Attorney, that the U.S. Attorney does not represent the Court nor does it speak for the Court in this case?

(R. Tr. at 35.)  Napoles replied in the affirmative.  (R. Tr. at 35.)  Additionally, as previously noted, Napoles informed the Court at his rearraignment that no one had promised him anything in exchange for pleading guilty, other than what was in the written agreement.  (R. Tr. at 26.)

Moreover, Napoles has failed to provide any specific information in support of his claim. Where a § 2255 movant claims that he was promised a specific sentence, in the face of his inconsistent statements under oath, his claim goes forward only under narrow circumstances. See United States v. Cervantes, 132 F.3d 1106, 1110 (5th Cir. 1998).  Specifically, a defendant may seek habeas relief on the basis of alleged promises, even though inconsistent with his representations in open court, by proving: (1) the exact terms of the alleged promise; (2) exactly when, where, and by whom the promise was made; and (3) the precise identity of an eyewitness to the promise. 132 F.3d at 1110.

A defendant is entitled to an evidentiary hearing on the issue if he can produce evidence showing the merit of his allegations, typically in the form of an affidavit from a reliable third party.  Id.

Napoles has not specified who on behalf of the United States supposedly made the alleged promise, nor when and where the promise was made.  Additionally, he has not even identified any eyewitness to his claim, let alone provided any affidavit from a reliable third party.  In short, then, his claim that he was "induced" into pleading guilty by the promise of a 60-month sentence is foreclosed by his own testimony and lack of any contradictory evidence as specified in Cervantes.

### 4.  Alleged Promise of a Substantial Assistance Departure

In his final challenge to his plea, Napoles contends that his counsel induced his guilty plea by telling him he would receive a downward departure motion for substantial assistance.  He complains that counsel failed to properly advise him as to what he needed to do to receive such a motion. According to Napoles, his counsel told him that if he truthfully debriefed about his own involvement in the offense, and "cooperated" in agreeing to forfeit certain assets, that he would receive a downward departure motion.

Notably, Napoles does not argue that he, in fact, substantially assisted the government as required for a motion under U.S.S.G. § 5K1.1.  That is, he does not claim that he provided any assistance "in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1.  Rather, he simply claims that he "cooperated" because he agreed to a forfeiture of certain assets and truthfully debriefed about his own participation in the offense.  Thus, he admits that he did not do what he needed to do to obtain a downward departure motion under U.S.S.G. § 5K1.1.[7]

---

[7] This is consistent with his counsel's recollection of events, as well.  His counsel, Everto A. Villarreal, Jr., has provided an affidavit in which he denies Napoles' claims of ineffective assistance and their factual

Napoles' claim of a promised downward departure motion fails for the same reasons his claim of a promised 60-month sentence failed.  First, his claim is directly contradicted by his own testimony under oath at his rearraignment.  (See R. Tr. at 26 (Napoles testifying that no one had promised him anything and that he had not been promised a motion for downward departure).)

Second, he has not provided any evidence, as required by Cervantes, supra, that such a promise was ever made.  See Cervantes, 132 F.3d at 1110.  This claim also fails.

Because the Court concludes that Napoles' challenges to the validity of his plea agreement fail, the Court finds that his plea agreement and his waiver of § 2255 rights contained therein are valid and enforceable. Accordingly, the Court turns to the effect of his waiver of § 2255 rights on his remaining claims.

## C.      Waiver of § 2255 Rights

It is clear from the rearraignment that Napoles understood that he was waiving his right both to appeal (except under certain circumstances) and to file any § 2255 motions, all that is required for his waiver to be enforceable. (R. Tr. at 23-24.)  See Wilkes, 20 F.3d at 653 (waiver is knowing if defendant understood he had a right, and understood he was giving it up).  Again, Napoles' statements

---

underpinnings.  (See generally D.E. 505, Villarreal Aff.)  As to Napoles' claims regarding substantial assistance, Villarreal avers that: "During the Plea Negotiations, I did encourage Mr. Napoles to consider cooperating with the government, as most of his co-defendants had already done so, and there was nothing to lose, and something to gain, but he repeatedly refused." (D.E. 505, Villarreal Aff. at 1.)
Villarreal further testifies:

> Again, the plea agreement was completely explained to Mr. Napoles, as were the different levels of cooperation and assistance to the government. Downward departures was never extensively discussed with Mr. Napoles because of his refusal to cooperate with the government.

> As to any assets to be turned over, this was a result of the indictment – not cooperation.  A downward departure was never promised was never promised [sic] by anyone.

(D.E. 505, Villarreal Aff. at 2.)

under oath are entitled to a strong presumption of truthfulness.  Wilkes, 20 F.3d at 653; Cothran, 302

F.3d at 283-84.  Those statements support the Court's conclusion that his waiver was knowing and

voluntary.  Napoles' remaining claims are that he received ineffective assistance of counsel at

sentencing and on appeal, and his supplemental claim that he was "actually innocent" because he did

not engage in some of the threats as found by the Court at sentencing.  All of these claim fall squarely

within the scope of his waiver.  Therefore, they are not properly before the Court.  For these reasons,

Napoles' § 2255 motion is DENIED in its entirety.

## D.    Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus

proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C.

§ 2253(c)(1)(A).  Although Napoles has not yet filed a notice of appeal, this Court nonetheless

addresses whether he would be entitled to a COA.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th

Cir. 2000) (a district court may *sua sponte* rule on a COA because "the district court that denies a

petitioner relief is in the best position to determine whether the petitioner has made a substantial

showing of a denial of a constitutional right on the issues before that court. Further briefing and

argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue...only if the applicant has made a substantial showing of the denial of a

constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an

overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v.

Cockrell, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  This standard requires

a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have

been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

As to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reasons would find it debatable whether the petition states a valid claim of the denial of a constitutional right ***and*** that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484 (emphasis added).

Based on the above standards, the Court concludes that Napoles is not entitled to a COA as to any of his claims. That is, reasonable jurists could not debate the Court's resolution of his claims challenging his plea and waiver  Similarly, jurists of reason would not find it debatable that his valid and knowing waiver precludes consideration of the remainder of his claims.

## E.    Appointment of Counsel

Napoles has also filed a motion seeking the appointment of counsel. (D.E. 510.) There is no constitutional right to counsel in § 2255 proceedings. See United States v. Vasquez, 7 F.3d 81, 83 (5th Cir. 1993); see also Pennsylvania v. Finley, 481 U.S. 551, 555  (1987)("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.") (citation omitted).  There are certain situations in the course of § 2255 proceedings, in which the Court is required to appoint counsel.  See, e.g., RULES GOVERNING § 2255 PROCEEDINGS 8(c) (requiring that counsel be appointed upon determination that an evidentiary hearing is required); id at Rule 6(a) (court must assign counsel to financially eligible defendants "[i]f necessary for effective discovery").  None of those are implicated here.

The Court expressly notes that, throughout these proceedings, Napoles has been able to adequately raise his claims and arguments in a cogent manner and address and respond to the government's arguments.  Thus, the interests of justice did not require the appointment of counsel.

22

Additionally, because the Court has now denied his § 2255 motion, there is no need for appointment of counsel in this proceeding. His motion for appointment of counsel (D.E. 510) is therefore DENIED.

## V.  CONCLUSION

For the above-stated reasons, Napoles' motion under 28 U.S.C. § 2255 (D.E. 503) is DISMISSED WITH PREJUDICE.  The Court also DENIES Napoles' motion for appointment of counsel (D.E. 510) and DENIES Napoles a Certificate of Appealability.

It is so ORDERED this 26th day of September, 2007.

Janis Graham Jack
United States District Judge